**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| VICTOR L. JORDAN, SR., | : | |
| *Plaintiff,* | : | |
| | : | No. 3:24-cv-01694 (VAB) |
| v. | : | |
| | : | |
| COLLEEN GALLAGHER, *et al.,* | : | |
| *Defendants.* | : | |
| | : | |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Victor L. Jordan, Sr. ("Plaintiff"), a sentenced inmate in the Connecticut Department of

Correction ("DOC"), has sued Colleen Gallagher, Dr. Gloria Perry, and Brane Blackstock

(collectively, the "Defendants").

The Defendants have filed a motion for summary judgment, ECF No. 44, and a

supporting memorandum, ECF No. 44-1, as well as a Local Rule 56(a)1 statement, ECF No. 44-

2, and related exhibits, ECF Nos. 44-4 through 44-11, to which Mr. Jordan has responded, Local

Rule 56(a)2 statements and exhibits, ECF Nos. 46, 47, 49.

For the reasons discussed below, the Defendants' Motion for Summary Judgment, ECF

No. 44, is **GRANTED**.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

### A.       Factual Allegations[1]

This case relates to Mr. Jordan's dental care at his current facility, Cheshire Correctional

Institution ("Cheshire CI"). Because this case is limited to conduct occurring at Cheshire CI, and

because there is no longer a claim for injunctive relief as to ongoing conduct in this case, the

relevant timeframe is November 3, 2023, until October 23, 2024.

During the relevant time, Dr. Perry worked as a dentist with the DOC at Cheshire CI.[2]

*See* L.R. 56(a)1 Stmt. ¶¶ 5, 7. Captain Blackstock has served as a captain at Cheshire CI since

2021, and he also acts as Cheshire CI's Americans with Disabilities Act ("ADA") coordinator.

*See id.* ¶¶ 9–10. Director Gallagher, during the relevant time, acted as the DOC's Correctional

---

[1] Mr. Jordan has a related case, *Jordan v. Correction, et al.*, 23-731 (MPS), pending before a different judge in this District. Mr. Jordan is represented by counsel in that case. In this case, Mr. Jordan seeks to introduce and rely on an expert report offered by Dr. Dennis Flanagan, a dental surgeon, whose opinion is offered in that case. Ex., ECF No. 47. Defendants object. Obj., ECF No. 48. But Mr. Jordan did not disclose Dr. Flanagan as an expert in this case before the end of discovery (October 2025). *See* Initial Review Order at 16, ECF No. 17. "Rule 26 of the Federal Rules of Civil Procedure requires a party seeking to use an expert witness to disclose the expert's identity." *Caruso v. Bon Secours Charity Health Sys., Inc.*, 703 F. App'x 31, 33 (2d Cir. 2017) (summary order) (citing Fed. R. Civ. P. 26(a)(2)(A)). Because Dr. Flanagan is not an expert in this case and thus cannot testify, his expert report is inadmissible hearsay. *See Winfield v. City of New York*, No. 15CV05236LTSKHP, 2017 WL 2880556, at *4 (S.D.N.Y. July 5, 2017), *objections overruled*, No. 15 CV 5236-LTS-KHP, 2017 WL 5054727 (S.D.N.Y. Nov. 2, 2017) ("Expert reports themselves are typically the subject of hearsay objections and not admitted into evidence at trial."); *see also Figueroa v. Mazza*, 825 F.3d 89, 98 n.8 (2d Cir. 2016) (recognizing that "any evidence considered on summary judgment must be reducible to admissible form").

Mr. Jordan also makes no argument that the failure to disclose this expert "was substantially justified or is harmless." *Id.* (citing Fed. R. Civ. P. 37(c)(1)). And, in fact, harmlessness would be difficult to argue here where Defendants have not had an opportunity to depose Dr. Flanagan, nor could they have considered whether to offer a rebuttal expert. In any event, as the Defendants point out, Dr. Flanagan's expert opinion is based on a different case's record evidence. Just as importantly, as discussed below, nothing in this expert report creates a genuine issue of fact as to any of Mr. Jordan's claims in this case.

Relatedly, Mr. Jordan amended his Local Rule 56(a)(2) statement to add citations to Dr. Flanagan's report. *See* L.R. 56(a)2 Stmt., ECF No. 47. Because Dr. Flanagan's report is not part of this record, the Court cites to Plaintiff's original Local Rule 56(a)(2) statement, ECF No. 46, rather than to his amended statement.

[2] Mr. Jordan appears to dispute that Dr. Perry is a dentist with the DOC. *See* L.R. 56(a)2 Stmt. at 6. Apart from citing generally to his declaration, he cites no competent evidence to dispute that statement.

Health Services Program Director. *See id.* ¶ 14. This role includes reviewing and responding to inmates' administrative appeals. *See id.* ¶ 15.

On November 3, 2023, Mr. Jordan was transferred from Corrigan Correctional Center to Cheshire CI. *See id.* ¶ 17. Three days later, Mr. Jordan requested medical treatment through an inmate request addressed to "Dental," indicating that his "old partial" denture had "broken." *See id.* ¶ 18; Ex. A, Medical Records at 71, ECF No. 43 ("Ex. A"). He reported that this broken denture caused him to bite his lip. *Id.*

On November 9, 2023, Mr. Jordan saw Dr. Perry for dental treatment. *See* L.R. 56(a)1 Stmt. ¶ 19. Dr. Perry examined Mr. Jordan and took and reviewed X-rays of Mr. Jordan's teeth. *See id.* ¶ 20; Ex. A at 74–75. According to the notes, the tooth at issue—tooth 31—was scheduled for an extraction. Ex. A at 74. Dr. Perry noted:

> Exam and [attempted] to get clarity on what is going on with removing tooth # 31 which is required as part of completing all needed dental work prior to making a new partial. [Mr. Jordan] stated that he has been on list to go to UCONN. tooth was not removed by DOC dentist because [Mr. Jordan] says he has too much [anxiety]. Will also need to determine when last partial was made to determine if enough time has [elapsed] to make him eligible for a new partial. Also need to determine if the root canals on # 11, # 12 are healing or failing and if teeth [are] strong enough to support a partial.

*Id.*

On November 15, 2023, Dr. Perry submitted a "Prosthetic Approval Request," requesting a partial denture replacement for Mr. Jordan. *See* L.R. 56(a)1 Stmt. ¶ 23. This request was approved. *See id.*

On December 11, 2023, Mr. Jordan submitted a health services remedy. *See id.* ¶ 27; Ex. H, ECF No. 44-11. In it, he said his partial denture should "take priority" because it is causing him "pain and discomfort." Ex. H. He also said that he was "refus[ing] extraction" of his other

tooth, and that he cannot "be coerced to accept unwanted treatment" where his tooth was "not causing [him] any pain or discomfort at the moment." *Id.*

On December 19, 2023, Mr. Jordan had another appointment with Dr. Perry. *See* L.R. 56(a)1 Stmt. ¶ 24. The notes include that Dr. Perry "[c]hecked tooth # 31, no pain does not wish to remove tooth to get a partial upper denture." Ex. A at 69. In his declaration, Mr. Jordan disputes these notes, indicating that he disputes the "context of [the] conversation." L.R. 56(a)2 Stmt. at 6. Mr. Jordan says he "chose the partial because he was [led] to believe he had no other choice by [the] Dental Department." *Id.*

The notes reflect that Dr. Perry requested permission from the Dental Director to "do [a] partial upper" denture without removing tooth number 31. Ex. A at 69. Approval was granted. *Id.*

On January 4, 2024, Mr. Jordan had an appointment with Dr. Perry, at which Dr. Perry took impressions of Mr. Jordan's teeth for a partial denture. *See* L.R. 56(a)1 Stmt. ¶ 28; Ex. A at 67.

On January 24, 2024, Mr. Jordan had another appointment with Dr. Perry, at which another impression was taken. *See* L.R. 56(a)1 Stmt. ¶ 30; Ex. A at 56–60.

One month later, on February 22, 2024, Mr. Jordan went back to Dr. Perry for a "try in visit" for his partial denture. *See* L.R. 56(a)1 Stmt. ¶ 31; Ex. A at 51–55. The notes indicate that the visit was intended to color match the partial denture, and the notes reflect that Mr. Jordan's speech with the new denture was "very good." Ex. A at 55. Mr. Jordan disputes these notes, saying that the partial denture did not sit "right from the start," and "had to be adjusted," so he "could not speak well." L.R. 56(a)2 Stmt. at 7 (citing his declaration for support).

On March 14, 2024, Mr. Jordan saw Dr. Perry again to receive his partial denture. *See* L.R. 56(a)1 Stmt. ¶¶ 33–35; Ex. A at 46–50. The notes indicate, "speech and esthetics good,

given spill about not leaving cell without teeth and 7 years before remake all papers signed." *See* L.R. 56(a)1 Stmt. ¶ 35; Ex. A at 50. The notes also reflect that Dr. Perry removed the "left clasp" that had prevented "biting" and the denture from seating fully. *See* L.R. 56(a)1 Stmt. ¶ 34; Ex. A at 50. Mr. Jordan signed receipt of the partial denture. *See* L.R. 56(a)1 Stmt. ¶ 36; Ex. A at 44–45. Mr. Jordan disputes whether the partial denture was properly fitted, and he says that Dr. Perry "did not know how to adjust the wire." L.R. 56(a)2 Stmt. at 7 (citing his declaration). Mr. Jordan says that he "was told by Dr. Perry to try and get use[d] to the new partial, as it was still not sitting securely," and that he "definitely could not speak properly." *Id.*

Also on March 14, 2024, Mr. Jordan submitted a request to "Dental," writing, "I need to see you again, regarding the new partial." *See* L.R. 56(a)1 Stmt. ¶¶ 37–38; ECF No. 46 at 249.

On March 26, 2024, Mr. Jordan went back to Dr. Perry for an adjustment on his partial denture. *See* L.R. 56(a)1 Stmt. ¶ 38; Ex. A at 39–43. The notes from that visit reflect that Dr. Perry "[a]djusted partial and clasp finally got it to fit but not staying in place," and that Dr. Perry "[t]ook new impressions and bite, sent back to lab to add clasp more to front where there is clearance ([inmate] had requested posterior clasp but could not bite or could not seat)." *See* L.R. 56(a)1 Stmt. ¶¶ 40–41; Ex. A at 43.

On April 16, 2024, Mr. Jordan went to Dr. Perry for the adjusted partial denture. *See* L.R. 56(a)1 Stmt. ¶ 42; Ex. A at 32–36. The notes reflect that Dr. Perry "[s]eated [the] partial and adjusted acrylic where bite was too hard." Ex. A at 36. She added that Mr. Jordan was "satisfied with [the] final result after adding back clasp." *See* L.R. 56(a)1 Stmt. ¶ 44; Ex. A at 36. Mr. Jordan disputes that he was satisfied with the final result; instead, he says that "the partial still did not seat right," and he recounts that Dr. Perry said he "should try to work with it, and get

use[d] to it." L.R. 56(a)2 Stmt. at 8. The notes from April 16, 2024, also reflect that Mr. Jordan "got a kick out of being called trouble man like the song." Ex. A at 36.

On April 21, 2024, Mr. Jordan wrote to "Dental" again, saying "[t]he wire broke off on the partial on the right side. See you soon." *See* L.R. 56(a)1 Stmt. ¶ 45; Ex. A at 26.

On April 29, 2024, Dr. Perry saw Mr. Jordan again, and the notes reflect that he said he tried to adjust the wire, but it broke off. *See* L.R. 56(a)1 Stmt. ¶¶ 46–47; Ex. A at 31. The notes further reflect that the denture fits well now but the wire needs to be put back on for stability. *See* L.R. 56(a)1 Stmt. ¶ 47; Ex. A at 31. Dr. Perry took a new impression and sent the partial denture back to the lab to be remade with a new clasp. *See* L.R. 56(a)1 Stmt. ¶ 48; Ex. A at 31.

On June 17, 2024, Mr. Jordan met with Dr. Perry for what would be the last time to receive his readjusted partial denture. *See* L.R. 56(a)1 Stmt. ¶¶ 49, 52; Ex. A at 20–24. The notes reflect that Dr. Perry "placed [the] partial (snapped into place good fit, [Mr. Jordan] likes and praised fit and feel)." *See* L.R. 56(a)1 Stmt. ¶¶ 49–50; Ex. A at 24. The notes add that no adjustments were made, and Mr. Jordan was happy with the new partial denture. *See* L.R. 56(a)1 Stmt. ¶ 50; Ex. A at 24. Mr. Jordan disputes these notes, responding that the partial denture did not fit as it should. L.R. 56(a)2 Stmt. at 8 (citing his declaration and exhibit A for support).

On July 4, 2024, Mr. Jordan submitted an inmate request form to "Dental," writing:

> The partial denture is now breaking in my mouth. This is getting ridiculous. I want an independent dental lab to address my dental needs because I believe there is to[o] much conflict of interest and ill will going on with this D.O.C. Department, because of my litigations, and also the negative comments from Dental assistant, that was offensive and suggestive that because I complain and grieve I am in the wrong, and all of these errors, in a simple partial fitting, is clear of the reason why I have been having the problems with your Department for over two years. This is a violation of the ADA/RA and Deliberate Indifference to say the least. I will be giving these sorry partial [sic] to my attorney.

6

Opp'n at 76, ECF No. 46.

On July 23, 2024, Mr. Jordan submitted a health services remedy form about his partial denture. *Id.* at 77. He wrote that the partial denture was "highly inadequate," and "the fact that it started cracking and breaking in my mouth while eating is a prime example." *Id.*  He said that the partial denture caused pain in his other top teeth, on his gums, and when he bit down on food. *Id.* He asked to be sent to an independent dentist for treatment. *Id.*

On August 6, 2024, Mr. Jordan submitted another request to Director Gallagher, writing, relevantly, "I am sending you these copies of grievances (HSAR) I've submitted, regarding delay, prevention and denial of proper medical care." *Id.* at 80.

On August 15, 2024, Mr. Jordan submitted a request for reasonable accommodations to Captain Blackstock. *See* L.R. 56(a)1 Stmt. ¶ 55; Pl.'s Opp'n at 82. He wrote,

> This regards my dental health matter. Where I have been denied proper dental care, by way of allowing me to be without an adequate denture (partial) that is not broken and that forces me to constantly bite my tongue and upper and bottom lips for over [two] years. And when they attempted to replace, the replacement keeps being inadequate and worse and breaks and broken. . . . I require to be seen by a competent Dr. and Dental Technician outside of this facility, and treated so as to correct this problem that prevents me from eating properly and me not hurting myself. Not having a proper prosthetic to do a major life activity is a[n] ADA/RA violation and for me to be denied this for over [two] years and that was by design and deliberate indifference. Also it's been [two] years since I was scheduled to have a tooth pulled on my right bottom (back) molar, that forces me to only eat (chew) on [the] left side, so this request has two major issues that I need fixed to be able to eat properly, without pain and discomfort.

*See* L.R. 56(a)1 Stmt. ¶¶ 55–56; Opp'n at 82.

On August 26, 2024, Mr. Jordan had a dental appointment with a different provider, at which he informed the provider that his partial denture had broken but that he did not bring it with him. Ex. A at 13–19.

On August 27, 2024, Captain Blackstock denied Mr. Jordan's August 15, 2024 request:

> after consulting with dental staff you had multiple appointments during the course of this year. You were examined on 1/4/24, 1/24/24, 2/22/24, 3/14/24, 3/26/24, 4/16/24 and 4/29/24 . . . you were also examined on 6/17/24 and you were issued partial dentures. Also on 8/26/24 you were examined and given a cleaning, Dental staff also indicated no need for any extraction.

*See* L.R. 56(a)1 Stmt. ¶ 57; Opp'n at 82. On September 5, 2024, Cheshire's acting warden further denied Mr. Jordan's request. *See* L.R. 56(a)1 Stmt. ¶ 57; Opp'n at 82.

On September 6, 2024, and September 18, 2024, Mr. Jordan filed an appeal of the denial. Opp'n at 84–86. On October 16, 2024, and October 24, 2024, Director Gallagher rejected his appeal. *Id.* at 85–87.

Mr. Jordan generally disputes these denials, citing his declaration and the administrative record. L.R. 56(a)2 Stmt. at 9–11. He alleges that both Captain Blackstock and Director Gallagher had a duty to investigate his claims, and that he personally informed them of his complaints. *Id.*

### B.    Procedural History

On October 23, 2024, Mr. Jordan filed a Complaint under 42 U.S.C. § 1983, alleging eight Defendants violated his federally protected rights. Compl., ECF No. 1. On March 28, 2025, the Court conducted an initial review of the Complaint under 28 U.S.C. § 1915A(a). Initial Review Order, ECF No. 17.

In its initial review order, the Court dismissed all claims except Mr. Jordan's Eighth Amendment claims for deliberate indifference to medical needs against Director Gallagher, Dr. Perry, and Captain Blackstock in their individual capacities, and Mr. Jordan's First Amendment retaliation claim against Dr. Perry in her individual capacity.[3] *Id*. at 15–16. The Court also

---

[3] To the extent that Mr. Jordan attempts in his opposition to argue new claims or to reargue claims that the Court has

allowed Mr. Jordan to pursue an Eighth Amendment claim for injunctive relief against Warden

Jennifer Reis in her official capacity, *id.*, but later *sua sponte* dismissed that claim, ECF No. 32.

On March 13, 2025, Mr. Jordan moved for a temporary restraining order and preliminary

injunction. Mot. for Temporary Restraining Order, ECF No. 16. The Court ordered a response,

ECF No. 18, and, after Defendants filed their opposition, ECF No. 30, the Court denied that

motion, ECF No. 32.

On June 25, 2025, Defendants moved to dismiss Mr. Jordan's Complaint, ECF No. 27,

and Mr. Jordan opposed that motion, ECF No. 33. The Court granted in part and denied in part

the Defendants' motion to dismiss, concluding that all claims against Warden Reis were

dismissed but that Mr. Jordan's claims against Director Gallagher, Dr. Perry, and Captain

Blackstock would proceed. Order at 8–9, ECF No. 40. The Defendants then answered Mr.

Jordan's Complaint. Answer, ECF No. 41.

On January 30, 2026, the Defendants moved for summary judgment. Mot. for Summ. J.,

ECF No. 44.

On February 10, 2026, Mr. Jordan filed an opposition to the motion, ECF No. 46. On

March 19, 2026, Mr. Jordan filed an exhibit in support of his opposition, ECF No. 47.

On March 23, 2026, the Defendants objected to Mr. Jordan's exhibit, ECF No. 48. On

April 13, 2026, Mr. Jordan filed an additional exhibit, ECF No. 49.

## II.    STANDARD OF REVIEW

A motion for summary judgment may be granted only where there is no genuine dispute

as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113–14

---

previously dismissed, the Court does not consider those arguments. *See* Opp'n at 12–13 (arguing ADA claims); *id.* (arguing Dr. Perry committed insurance fraud).

(2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113–14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense . . ." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To do this, the non-moving party cannot "rely on conclusory allegations or unsubstantiated speculation," *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted), but must instead "offer some hard evidence" on which "the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted; emphasis in original).

All ambiguities and all permissible factual inferences are drawn in favor of the non-moving party. *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012). However, although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

10

**III.    DISCUSSION**

The Defendants argue they are entitled to summary judgment for three reasons: (1) Mr. Jordan's Eighth Amendment deliberate indifference claim fails on the merits; (2) Mr. Jordan's First Amendment claim against Dr. Perry fails on the merits; and (3) all Defendants are entitled to qualified immunity for each claim.

The Court addresses these arguments in turn.

**A.  The Deliberate Indifference to Serious Medical Needs Claim**

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs. *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to serious medical needs, the prisoner must allege facts satisfying both an objective component and a subjective component. *See id.*

The objective component requires the prisoner to demonstrate that the alleged deprivation of medical care was "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). This objective showing requires a court to make two inquiries. *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023).

First, the court must determine whether the inmate was "actually deprived of adequate medical care" by an official's failure "to take reasonable measures in response to a sufficiently serious medical condition . . ." *Id.* at 279–80; *see also Davila v. UConn Med. Ctr.*, 353 F. App'x 490, 492 (2d Cir. 2009) (summary order) ("At the most basic level, to establish a claim under the Eighth Amendment for deliberate indifference, the plaintiff must first demonstrate that he was 'actually deprived of adequate medical care.'" (quoting *Salahuddin*, 467 F.3d at 279)).

Second, the court must determine "whether the inadequacy in medical care is sufficiently

serious," requiring an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. This examination differs based on whether the issue is failure to provide *any* medical treatment, inadequate treatment, or delayed treatment. *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). This inquiry is necessarily contextual and fact specific. *Id.* at 185.

As to the subjective component, "[a]n official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety,'" which is "a state of mind 'equivalent to the familiar standard of recklessness' as used in criminal law." *Id.* at 184 (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Conduct may rise to the level of deliberate indifference when the prison official's act or failure to act "evinces 'a conscious disregard of a substantial risk of serious harm.'" *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Farmer*, 511 U.S. at 839).

"A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference[,] [n]or does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Young v. Choinski*, 15 F. Supp. 3d 172, 182–83 (D. Conn. 2014) (internal quotation marks omitted); *see also Chance*, 143 F.3d at 703 (noting that "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Allegations constituting negligence or medical malpractice are insufficient to support an Eighth Amendment deliberate indifference claim. *Thomas v. Wolf*, 832 F. App'x 90, 92 (2d Cir. 2020) (summary order) (citing *Hathaway*, 99 F.3d at 553).

12

Mr. Jordan's deliberate indifference claim concerns two allegations: (1) that prison dental staff failed to extract a tooth that "is on the verge of becoming infected," Compl. at 5, and (2) prison dental staff did not properly fit his partial denture and left Mr. Jordan to "figure it out for [him]self," *id.* at 6.

Each allegation will be addressed in turn.

### 1. The Extraction of Tooth 31 Claim

The Defendants argue that this issue was not "sufficiently serious," and thus cannot satisfy the objective prong. Even if "sufficiently serious," the Defendants argue that there is no genuine issue of material fact as to whether Dr. Perry acted or failed to act after becoming aware of a substantial risk of serious harm to Mr. Jordan.

In response, Mr. Jordan argues that Dr. Perry was "aware of the tooth, and the urgency of the details," Opp'n at 27–28, denies that he refused extraction of his tooth, and argues that this tooth "was an issue [four] years ago," and that his tooth was "left to deteriorate," leaving him with "no other option" besides extraction, *id.* at 21. He alleges he has been on the list for extraction since July 2022, and that Defendants here denied "his reasonable accommodation request" regarding going to the University of Connecticut "to remove and fix" tooth 31. *Id.* at 25. He claims the "delayed treatment" of tooth 31 was because it was "cheaper, and more cost effective" to extract rather than to restore the tooth. *Id.* at 41.

The Court disagrees.

Even assuming that Mr. Jordan's tooth was "near infection" and sufficiently serious, therefore satisfying the objective component, as to the subjective component, there must be record evidence showing that Defendants knew of and disregarded an excessive risk to inmate health or safety. *Smith*, 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element

ensures that the defendant prison official acted with a sufficiently culpable state of mind.")
(citations omitted). Here, there is none.

The undisputed evidence shows Dr. Perry was not aware of any condition stemming from tooth 31 that significantly impacted Mr. Jordan's life activities. Indeed, Dr. Perry asked Mr. Jordan about his tooth, and timely recorded the interaction in her contemporaneous medical notes:

> Exam and [attempted] to get clarity on what is going on with removing tooth # 31 which is required as part of completing all needed dental work prior to making a new partial. [Mr. Jordan] stated that he has been on list to go to UCONN. tooth was not removed by DOC dentist because [Mr. Jordan] says he has too much [anxiety] . . .

Ex. A at 74.

While Mr. Jordan may "rely on his own testimony," *Baltas v. Maiga*, 119 F.4th 255, 267 (2d Cir. 2024), as to what happened, "[m]ultiple courts have declined at summary judgment to credit statements by a plaintiff that are flatly contradicted by contemporaneous medical records." *Chimney v. Quiros*, No. 3:21-CV-00321 (JAM), 2023 WL 2043290, at *3 (D. Conn. Feb. 16, 2023), *aff'd sub nom. Chimney v. Feder*, No. 23-6478, 2025 WL 2629833 (2d Cir. Sept. 12, 2025) (collecting cases); *see also Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (affirming grant of summary judgment where sworn deposition testimony, although specific, was "unsupported by documentary or other concrete evidence" and was "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Vega v. Rell*, 611 F. App'x 22, 25–26 (2d Cir. 2015) (affirming district court who "analyzed [the plaintiff's] affidavit's counter-assertions of fact, but concluded that his uncontroverted medical records undercut each one").

14

Moreover, "evidence of a prisoner's refusal of care 'effectively rebut[s] claims of deliberate indifference to serious medical needs.'" *Alster v. Goord*, 745 F. Supp. 2d 317, 334 (S.D.N.Y. 2010) (quoting *Rivera v. Goord,* 253 F.Supp.2d 735, 756 (S.D.N.Y. 2003)). The undisputed evidence shows that Mr. Jordan refused extraction of tooth 31. He admits as much at points in his opposition, saying he "refused extraction because first after a year, when the tooth was scheduled to be restored, it was allowed to become worse." Opp'n at 41–42. He adds that "on each subsequent times [sic] of refusal, the same department was the reason why." *Id.* at 42.

In any event, even if Mr. Jordan did not refuse care, there is nothing in this record to suggest that Dr. Perry disregarded an excessive risk to inmate health or safety. In fact, the contemporaneous medical notes reflect that Dr. Perry sought "to get clarity on what is going on with removing tooth # 31 which is required as part of completing all needed dental work prior to making a new partial." Ex. A at 74. While Mr. Jordan may disagree with what Dr. Perry said or did, there is nothing in this record to suggest that this was anything more than a disagreement about her medical decisions, rather than a disregard for an excessive risk to his health and safety.[4] "[T]he prison official's duty is only to provide reasonable care," *Salahuddin*, 467 F.3d at 279, not "the type or scope of medical care which [the inmate] personally desires," *U. S. ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (internal quotation marks omitted); *see also Collins v. Figura*, No. 3:19 CV 1689(RMS), 2023 WL 118495, at *11 (D. Conn. Jan. 6, 2023), *aff'd*, No. 23-109, 2024 WL 1739084 (2d Cir. Apr. 23, 2024) (noting that "[i]t is well-established that an inmate does not have a right to the medical treatment of his choice" (citing *Hill v.*

---

[4] Mr. Jordan suggests that at some point during his treatment, an apparent error occurred in his dental records indicating, as of March 2024, that a "tooth extraction" was completed on tooth 31. *See, e.g.*, Ex. A at 22, 39-43. Significantly, as to the Tooth 31 issue, there is nothing in Dr. Flanagan's report that identifies Dr. Perry as having been deliberately indifferent to Mr. Jordan's health needs. In fact, there is no specific mention of Dr. Perry in Dr. Flanagan's report at all. Nor is there any discussion in Dr. Flanagan's report as to how Dr. Perry should have handled differently – let alone acted with deliberate indifference – Mr. Jordan's refusal of treatment, as reflected in Dr. Perry's contemporaneous notes. *Id.* at 69.

*Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment"))); *Chance*, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation"); *McIntosh v. City of New York*, 722 F. App'x 42, 46 (2d Cir. 2018) (summary order) ("To the extent that [the plaintiff] believes that she received inadequate treatment, 'mere disagreement over the proper treatment does not create a constitutional claim.'" (quoting *Chance*, 143 F.3d at 703)).

Because there is no record evidence that Dr. Perry knew of and disregarded an excessive risk to inmate health or safety, *Smith*, 316 F.3d at 184, such that a "jury could *reasonably* find for the plaintiff," *Jeffreys*, 426 F.3d at 554 (internal quotation marks omitted; emphasis in original), Mr. Jordan has not satisfied the subjective component of his deliberate indifference claim.

Accordingly, summary judgment is granted for Dr. Perry in this respect.

### 2.  The Partial Denture Claim

The Defendants argue that Dr. Perry "physically examin[ed] Plaintiff's teeth and mouth, [sought] and [received] approval for a replacement partial denture, order[ed] imaging and impressions of Plaintiff's teeth in order to fabricate a new partial denture, sen[t] those impressions to the lab so that a denture could be fabricated, and adjust[ed] and fit[ted] Plaintiff's partial denture as needed and based on Plaintiff's requests." Mem. at 19 (citing L.R. 56(a)1 Stmt. ¶ 20-21, 23-26, 28-36, 39-44, 46-51).

Mr. Jordan argues that Dr. Perry "could not and/or intentionally did not properly adjust and fit[]" the denture, and instead "she only made it wors[e] to the point of injuring" Mr. Jordan. Opp'n at 24–25. This, he argues, left "him without a proper denture he could eat with without

doing further harm to himself and [experiencing] discomfort." *Id.* at 25.

The Court disagrees.

Again, while Mr. Jordan disagrees with the medical treatment provided to him, "[i]t has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d at 123. And his testimony does not suggest anything more than a disagreement. Significantly, Mr. Jordan's testimony that Dr. Perry "could not and/or intentionally did not properly adjust and fit[]" the denture, and instead "only made it wors[e] to the point of injuring" him, Opp'n at 24–25, is not admissible lay testimony. Fed. R. Evid. 701(c) (opinion testimony by lay witnesses is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"); *cf. Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) ("[T]o the extent Huang's testimony was grounded in the investigation he undertook in his role as a Bank of China employee, it was admissible pursuant to Rule 701 of the Federal Rules of Evidence because it was based on his *perceptions. . .* However, to the extent Huang's testimony was not a product of his investigation, but rather reflected specialized knowledge he has because of his extensive experience in international banking, its admission pursuant to Rule 701 was error." (emphasis in original)).

There is nothing in this record to suggest that Mr. Jordan has the "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to know whether the denture had been "properly adjust[ed] and fit[ted]," or that any medical treatment by Dr. Perry "only made it wors[e] to the point of injuring" him. *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) ("[A] lay opinion must be the product of reasoning processes familiar to the average person in everyday life . . . The purpose of this final foundation requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness

17

without satisfying the reliability standard for expert testimony set forth in Rule 702[.]").[5]

Any testimony from Mr. Jordan that he felt "discomfort" or pain after a medical procedure may go to whether the alleged deprivation of medical care was "sufficiently serious." *Farmer*, 511 U.S. at 834. But this testimony alone, without evidence of the appropriateness or inappropriateness of Dr. Perry's medical decisions, cannot support a finding that Dr. Perry intentionally or recklessly delayed treatment, or acted to sabotage Mr. Jordan's partial denture, thereby satisfying the subjective component of his deliberate indifference claim. *See Jones v. Sheriff of Suffolk Cnty.*, 518 F. Supp. 3d 650, 658 n.8 (E.D.N.Y. 2021) ("the deliberate indifference standard requires the plaintiff to prove that the prison official knew of and disregarded the plaintiff's serious medical needs"); *Chance*, 143 F.3d at 703 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence"); *Davis v. Cheng Yin*, No. 06-CV-6491-CSJ-JWF, 2009 WL 10726829, at *7 (W.D.N.Y. Aug. 31, 2009) (finding that though experts provided evidentiary proof of malpractice, "as to the subjective component of a deliberate indifference claim, the Court finds no evidentiary proof in admissible form, expert or otherwise, showing that Dr. Yin *drew the inference* that Davis was at substantial risk of harm." (emphasis in original)). Indeed, even if Dr. Perry negligently treated Mr. Jordan,

---

[5] Significantly, once again, while Dr. Flanagan opines with respect to "proper treatment," Ex. at 3, ECF No. 47**,** and that "without chrome-cobalt dentures, Mr. Jordan is at risk of additional impairment of chewing and speech, as well as ongoing pain and discomfort," *id.* at 5, opinions which may be probative of a genuine issue of fact in another case, or of mere negligence, these opinions are not specific enough – indeed, again, they make no specific reference to Dr. Perry and the care specifically provided by Dr. Perry – to create a genuine issue of fact as to whether Dr. Perry knew or should have known that the use of all-acrylic dentures without a metal framework would not have been adequate dental treatment for Mr. Jordan when that specific procedure was performed. *See Jones v. Sheriff of Suffolk Cnty.*, 518 F. Supp. 3d 650, 658 n.8 (E.D.N.Y. 2021) (The Second Circuit's "knew or should have known" standard in defining deliberate indifference "requires either expert opinion or facts that would allow a reasonable jury to reach a conclusion of recklessness, not just negligence . . . because a jury cannot be allowed to guess at the degree of deviation from objectively reasonable medical practice. . . . Otherwise, the malpractice standard and the constitutional standard would merge, and liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.") (emphasis in original) (internal citations and quotations omitted).

mere negligence would be insufficient to sustain Mr. Jordan's claim. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("[M]ere allegations of negligent malpractice do not state a claim of deliberate indifference . . . .") (citations omitted).

As a result, on this record, no reasonable jury could conclude that Dr. Perry knew of and disregarded an excessive risk to inmate health or safety.

Accordingly, in the absence of a genuine issue of material fact as to either component of Mr. Jordan's deliberate indifference claim, summary judgment will be granted in Dr. Perry's favor.

### B. Personal Involvement of Defendants Blackstock and Gallagher

A supervisor's "mere awareness of an issue" is not sufficient to show personal involvement in a constitutional violation "because that knowledge does not amount[ ] to the supervisor's violating the Constitution." *Tangreti v. Bachman*, 983 F.3d 609, 616–17 (2d Cir. 2020). "[E]ven post-*Tangreti*, allegations that suggest 'more than simple receipt' of a grievance may, depending on the circumstances, support personal involvement." Initial Review Order at 12 (quoting *Anderson v. Quiros*, No. 3:24-CV-00408 (SVN), 2025 WL 2734580, at *6 (D. Conn. Sept. 25, 2025)).

To seek damages from a defendant on a deliberate indifference to serious medical needs claim, Mr. Jordan must show the defendant's "personal involvement" in the alleged constitutional violation. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotation marks omitted).

Here, personal involvement may be shown by facts suggesting that a defendant "treated [Mr. Jordan] or w[as] otherwise aware of his concerns." *Shand v. Connecticut Dep't of*

19

*Correction*, No. 3:21-CV-523 (SVN), 2022 WL 503952, at *11 (D. Conn. Feb. 18, 2022).

Captain Blackstock and Director Gallagher, neither of whom are medical professionals, argue that the undisputed record shows that their involvement was limited to denying and rejecting Mr. Jordan's administrative grievances, and, taking the evidence in the light most favorable to Mr. Jordan, failing to investigate his concerns. In his denial of Mr. Jordan's August 15, 2024, grievance, Captain Blackstock's response details his "consultat[ion] with dental staff," which showed nine dental appointments. *See* L.R. 56(a)1 Stmt. ¶ 57; Opp'n at 82.

In response, Mr. Jordan makes two points. First, in his view, Captain Blackstock had "full awareness of [his] condition" and that Mr. Jordan informed Captain Blackstock "on multiple occasions," but that Captain Blackstock "disregarded" him. Opp'n at 281 (adding that Captain Blackstock "mocked" him and made a "negative statement" about him "not being able to eat"). Second, in his view, he informed Director Gallagher of "medical inadequacies." *Id.* at 282.

The Court disagrees.

There is no record evidence that either Captain Blackstock or Director Gallagher was involved in the treatment of Mr. Jordan's dental issues or was aware of substantial risk to Mr. Jordan concerning his dental issue.

Thus, contrary to Mr. Jordan's argument, the undisputed record shows that Captain Blackstock did investigate Mr. Jordan's claim for purposes of responding to his grievance. In his declaration, Mr. Jordan does not clarify when he alleged Captain Blackstock had this knowledge. But, even accepting that Captain Blackstock had this knowledge at the relevant time, there is no record evidence that Captain Blackstock disregarded any risk to Mr. Jordan. Captain Blackstock's response showed he understood Mr. Jordan to have been to the dental department for care multiple times. No reasonable factfinder could conclude that Captain Blackstock's

20

response shows either a subjective awareness of a serious risk of harm to Mr. Jordan, or a disregard of the same.

The record as to Director Gallagher's personal involvement is even more tenuous. Director Gallagher's October 16, 2024, and October 24, 2024, rejections of Mr. Jordan's appeal were based not on the substance of his claims, but instead because he filed them in the wrong forum. Opp'n at 85–87. Such conclusory and non-specific testimony cannot create a genuine dispute of material fact. *See Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011) (a party opposing summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.").

In sum, no reasonable jury could find that either Captain Blackstock's response or Director Gallagher's response suggests that they "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result" from the actions or inactions of medical staff. *Salahuddin*, 467 F.3d at 280.

Accordingly, summary judgment must be granted for Captain Blackstock and Director Gallagher based on a lack of personal involvement as to Mr. Jordan's Eighth Amendment claim.

### C.  The First Amendment Retaliation Claim

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quotation omitted). For a First Amendment retaliation claim, a plaintiff must show: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him

some injury." *Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024) (quotation omitted). The official's retaliatory motive "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 399; *see Hartman v. Moore*, 547 U.S. 250, 260 (2006) (recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway").

As to the first element, "[p]rotected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance." *Baltas v. Snyder*, No. 3:24CV1487 (VAB), 2025 WL 509423, at *5 (D. Conn. Feb. 14, 2025), *reconsideration denied*, No. 3:24CV1487 (VAB), 2025 WL 1678425 (D. Conn. June 13, 2025) (quoting *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015)). Thus, Mr. Jordan's speech is protected.

As to the second element, the Second Circuit has defined adverse action as retaliatory conduct that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Hayes v. Dahlke*, 976 F.3d 259, 274 (2d Cir. 2020) (internal quotation marks and citation omitted). Here, Mr. Jordan submits that Dr. Perry intentionally sabotaged his partial denture, which, if proven, could constitute adverse action. *See Otluosin v. Lee*, No. 14-cv-685(NSR), 2016 WL 2899275, at *10 & n.5 (S.D.N.Y. May 16, 2016) (noting that "general allegations of denial of medical care are sufficient to allege an adverse action").

Mr. Jordan argues that Dr. Perry "intentionally sabotaged" his partial denture replacement because he was being "Mr. Trouble." *See* Opp'n at 277–78. Mr. Jordan claims that Dr. Perry referred to Mr. Jordan as "Mr. Trouble," and that Mr. Jordan had a "known habit" of

22

filing lawsuits and grievances against her colleagues. *Id.* at 35–36. Mr. Jordan claims Dr. Perry gave him "deficient" treatment because of his conduct. *Id.* at 36.

The Court disagrees.

In the absence of any record evidence that Dr. Perry intentionally or recklessly sabotaged his partial denture, no reasonable jury could find that Dr. Perry took adverse action against Mr. Jordan in retaliation for his exercise of his First Amendment rights.

Accordingly, the Court must grant summary judgment in favor of Dr. Perry as to the First Amendment retaliation claim.

### D.  The Qualified Immunity Defense

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken— decisions[.]" *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

"In determining whether state actors are entitled to qualified immunity under federal law, [the Court] consider[s] two factors: (1) whether the facts presented make out a violation of a constitutional right; and (2) whether the right at issue was clearly established when it was allegedly violated." *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021) (cleaned up). The

23

Court has discretion to determine the order in which it will address the inquiries required when assessing the applicability of qualified immunity. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Pearson,* 555 U.S. at 236). "In evaluating these two factors, [the Court] look[s] to the specific context of the case at bar rather than broad general proposition[s]." *Torcivia*, 17 F.4th at 367 (cleaned up).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia*, 17 F.4th at 367 (cleaned up). There is no requirement that precedent be directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In addition, qualified immunity protects state actors when it was "objectively reasonable" for the state actor to believe that his "conduct did not violate a clearly established right." *See Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017). "[I]f the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). But an official's conduct is "objectively unreasonable when no [official] of reasonable competence could have made the same choice in similar circumstances." *Id.* at 420–21.

Defendants argue that they are entitled to qualified immunity for all of Mr. Jordan's claims.

The Court agrees.

Because the Court has already determined that the facts presented do not "make out a violation of a constitutional right," *Torcivia*, 17 F.4th at 367, it was objectively reasonable for the Defendants to believe that their conduct did not violate a clearly established right, *see Washington v. Monroe*, No. 16-CV-9090(NSR), 2019 WL 1130155, at *8 (S.D.N.Y. Mar. 12, 2019) (concluding defendant was entitled to qualified immunity because record contained insufficient facts to show "it was unreasonable for a person in [health care provider's] position to believe that her alleged conduct . . . failed to provide him with adequate medical care and violated his constitutional rights").

Accordingly, even if any of Mr. Jordan's claims had been viable, the Defendants would have been entitled to qualified immunity as to all of them.

## IV.     CONCLUSION

For the reasons set forth above, the motion for summary judgment, ECF No. 44, is **GRANTED**. The Clerk of Court is respectfully directed to enter judgment, and to close this case.

SO ORDERED at New Haven, Connecticut, this 26th day of June, 2026.

 /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

25